**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEBRASKA**

| | |
|---|---|
| **RICHARD JEREMIAH PREECE, an Individual,** | |
| **Plaintiff,** | **8:13CV188** |
| **vs.** | **ORDER** |
| **THE COVENANT PRESBYTERIAN CHURCH, a Nebraska non-profit domestic corporation,** | |
| **Defendant.** | |

This matter is before the court after an evidentiary hearing on April 13, 2015, regarding the defendant's ministerial exception affirmative defense.[1]  A transcript (Tr.) of the hearing was filed on April 20, 2015.  **See** Filing No. 113.   The plaintiff was represented by Terry A. White and the defendant was represented by Jerald L. Rauterkus and Heather B. Veik.   The court heard testimony from Pastor Kevin McDonald (Pastor McDonald).  The court took judicial notice of all evidence previously filed in this matter, especially those exhibits and filings referenced by the parties during the hearing.  The defendant offered two additional documents (Ex. 101 and 102), which were not received and will not be considered as evidence in this matter.  The plaintiff filed a brief (Filing No. 97) and a supplemental brief (Filing No. 109-1) opposing application of the exception.   The defendant filed a brief (Filing No. 100) and a supplemental brief (Filing No. 111-1) supporting application of the exception.

## BACKGROUND

The defendant, an Evangelical Presbyterian Church, employed the plaintiff from August 2010, until July 2012.  **See** Filing No. 80 - Pretrial Order (PTO) ¶¶ 17, 62-67; Filing No. 57 - Ex. 3 McDonald Depo. p. 6; Filing No. 57 - Ex. 6 Leuders Depo. p. 7-8. The plaintiff alleges the defendant terminated his employment due to his gender and marital status, and in retaliation for complaining about sexual harassment committed by

---

[1] On March 6, 2015, Senior Judge Joseph F. Bataillon transferred this case to the undersigned in accordance with the parties' consent to jurisdiction by a United States Magistrate Judge and 28 U.S.C. § 636(c).  **See** Filing No. 83.

a pastor who was the plaintiff's direct supervisor.  **See** Filing No. 1 - Complaint ¶¶ 11, 15.  With regard to his marital status, the plaintiff alleges he filed for divorce during his employment and became the single parent of four children shortly before his termination.  *Id.* ¶ 10.  Prior to his divorce, the plaintiff alleges he was subjected to "episodes of uninvited touches, elongated frontal body hugs, back rubs and neck massages, private office visits, and unsolicited invitations for drinks, dinner and companionship," on a daily basis.  *Id.* ¶ 11.  Based on these allegations, the plaintiff asserts claims against the defendant for:  1) gender discrimination, in violation of Title VII of the Civil Rights Act of 1967, as Amended, 42 U.S.C. § 2000e-2, *et seq.* (Title VII), and the Nebraska Fair Employment Practices Act, Neb. Rev. Stat. § 48-1101, *et seq.* (NFEPA); 2) marital status discrimination, in violation of the NFEPA; and 3) retaliation, in violation of Title VII and the NFEPA.  **See** Filing No. 1 - Complaint.  The defendant generally denies the plaintiff's allegations, alleging the plaintiff resigned for personal reasons.  **See** Filing No. 13 - Answer.

On March 6, 2015, the court denied the defendant's motion for summary judgment finding material issues of fact existed about whether (1) the alleged sexual harassment was severe and pervasive enough to create a hostile work environment; and (2) the plaintiff was reasonable in reporting sexual harassment to the person who he wrongly believed to be his immediate supervisor.  **See** Filing No. 82.  Additionally, the court denied the defendant's motion seeking application of the First Amendment to the U.S. Constitution's ministerial exception to employment discrimination statutes to shield the defendant from liability.  Specifically, the court held material issues existed about whether the defendant employed the plaintiff as a "minister," such status being a prerequisite to applying the ministerial exception.  *Id.* at 4-5.  Accordingly, the court held the April 13, 2015, hearing to allow the parties to present any additional evidence or argument related to the defendant's affirmative defense for resolution of the matter prior to trial.

A.    **Ministerial Exception**

"The First Amendment provides, in part, that 'Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof.' . . .

Both Religion Clauses bar the government from interfering with the decision of a religious group to fire one of its ministers." ***Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.***, 132 S. Ct. 694, 702 (2012). "Since the passage of Title VII . . . and other employment discrimination laws, the Courts of Appeals have uniformly recognized the existence of a 'ministerial exception,' grounded in the First Amendment, that precludes application of such legislation to claims concerning the employment relationship between a religious institution and its ministers." ***Id.*** at 705-06 (agreeing "that there is such a ministerial exception"); see ***Scharon v. St. Luke's Episcopal Presbyterian Hosps.***, 929 F.2d 360, 362-63 (8th Cir. 1991) (applying exception to primarily ministerial position). The ministerial "exception operates as an affirmative defense to an otherwise cognizable claim. . . ." ***Hosanna-Tabor***, 132 S. Ct. at 709 n.4.

The Court determined,

> Requiring a church to accept or retain an unwanted minister, or punishing a church for failing to do so, intrudes upon more than a mere employment decision. Such action interferes with the internal governance of the church, depriving the church of control over the selection of those who will personify its beliefs.

***Hosanna-Tabor***, 132 S. Ct. at 706. The Court reasoned statutorily forcing retention of an unwanted minister "concerns government interference with an internal church decision that affects the faith and mission of the church itself." ***Id.*** at 707.

As a threshold matter, "the employer must be a religious institution and the employee must have been a ministerial employee." ***Conlon v. InterVarsity Christian Fellowship***, 777 F.3d 829, 834 (6th Cir. 2015) (relying on ***Hosanna-Tabor***, 132 S. Ct. at 699) (female spiritual leader terminated after divorce while two male employees retained). The parties agree the defendant is a religious institution. **See** Filing No. 80 - PTO ¶ 4; Filing No. 57 - Ex. 3 McDonald Depo. p. 6; Filing No. 57 - Ex. 6 Leuders Depo. p. 7-8; Filing No. 62 - Response Brief p. 2 (noting the plaintiff does not dispute the defendant's description of the defendant). The parties dispute whether the plaintiff's employment was ministerial.

The Supreme Court provided no "rigid formula for deciding when an employee qualifies as a minister," but the "exception is not limited to the head of a religious congregation." ***Hosanna-Tabor***, 132 S. Ct. at 707. The Court relied on facts such as

3

whether (1) the church held the employee out distinct from other members,[2] (2) the position held a title reflecting specialized training, (3) the employee held himself out as a minister according to the terms of the church, and (4) the job duties reflect a role in conveying the church's message and carrying out its mission.  *Id.* at 707-08.

The court conducts "a fact-intensive inquiry" when determining whether an employee works in a ministerial capacity for purposes of the exception.  ***Cannata v. Catholic Diocese of Austin***, 700 F.3d 169, 176 (5th Cir. 2012) (holding no genuine dispute ministerial exception applied to ADEA and ADA claims for church Music Director who engaged in some secular duties, but who, by choosing music and playing the piano at Mass, also actively participated in the liturgical assembly playing an integral role in furthering the church's mission).  The court must make "a determination of the functions of a church employee."  ***Ross v. Metropolitan Church of God***, 471 F. Supp. 2d 1306 (N.D. Ga. 2007) (applying exception to director of Worship Arts Department of church) (listing cases).  "However, whether the exception attaches at all is a pure question of law which this court must determine for itself."  ***Conlon***, 777 F.3d at 834 ("consider[ing] whether the ministerial exception would otherwise apply to [certain] facts," prior to considering if the employer waived the exception); **see *Miller v. Bay View United Methodist Church, Inc.***, 141 F. Supp. 2d 1174, 1181 (E.D. Wis. 2001) (applying ministerial exception to choir director as a matter of law); **see also *Hough v. Roman Catholic Diocese of Erie***, 2014 WL 834473, at *5 (W.D. Pa. Mar. 4, 2014) (noting the defendant's affidavits, alone, as evidence the plaintiffs' duties "reflected a role in conveying the Church's message and carrying out its mission" were insufficient to apply the ministerial exception prior to discovery).

Courts evaluating the propriety of the ministerial exception for employees explore the individual's functional role in the work setting and within the church.  Courts generally apply the exception to a "called" employee or those employed based on religious expertise.  **See *Hosanna-Tabor***, 132 S. Ct. at 707-08; ***Herzog v. St. Peter Lutheran Church***, 884 F. Supp. 2d 668 (N.D. Ill. 2012) (applying exception to age, gender, and marital status discrimination claims after termination for called teacher

---

[2] In his concurrence, Justice Thomas noted the critical question is whether the religious group sincerely considered the plaintiff a minister.  *Id.* at 710-11 (noting courts should "defer to a religious organization's good-faith understanding of who qualifies as its minister") (Thomas, J., concurring).

despite teaching mostly secular subjects); *Shaliehsabou v. Hebrew Home of Greater Washington, Inc.*, 247 F. Supp. 2d 728 (D. Md. 2003) (applying exception on FLSA claim to kosher supervisor hired for religious expertise, and who claimed clergy on taxes, performed non-routine tasks, including sacerdotal functions).  However, court generally allows employment discrimination cases to proceed where the employee is a lay teacher and for those whose duties are entirely secular.  *Davis v. Baltimore Hebrew Congregation*, 985 F. Supp. 2d 701 (D. Md. 2013) (denying application of ministerial exception to employee whose primary duties—maintenance, custodial, and janitorial work—were entirely secular); *Braun v. St. Pius X Parish*, 827 F. Supp. 2d 1312 (N.D. Okla. 2011) (rejecting ministerial exemption for lay teacher of secular subjects who was not member of parochial school faith); *Herx v. Diocese of Ft. Wayne-South Bend Inc.*, 2014 WL 4373617, at *8 (N.D. Ind. Sept. 3, 2014) (denying summary judgment becajse lay language arts junior high school teacher was not minister at parochial school); *Dias v. Archdiocese of Cincinnati*, 2013 WL 360355, at *4 (S.D. Ohio Jan. 30, 2013) (rejecting ministerial exception for lay teacher who, as a non-Catholic, was not permitted to teach Catholic doctrine).

In this case, the plaintiff received a Bachelor's degree in Bible and Theology from Moody Bible Institute and studied for a Master's of Divinity, prior to his employment with the defendant in August 2010.  **See** Filing No. 56 - Ex. 1 Preece Depo. p. 8-10.  Although not ordained by the defendant, the plaintiff was an ordained minister through a non-denominational entity called Rose Ministries.  *Id.* at 32; Filing No. 80 - Pretrial Order ¶ B(13).  The plaintiff listed his occupation as a minister on his tax forms.  **See** Filing No. 56 - Ex. 1 Preece Depo. p. 37; Filing No. 58-2 p. 4.  On June 11, 2010, the defendant extended an offer to the plaintiff for the position of "Director of Youth Ministry."  **See** Filing No. 58-7 p. 11 June 11, 2010, Letter.  On June 15, 2010, the plaintiff accepted the position as "youth minister."  **See** Filing No. 58-1 - Ex. 8 Preece Letter.  Nevertheless, the plaintiff learned the defendant "took nomenclature very serious" and would not call him a minster or pastor unless he was ordained through the defendant.  **See** Filing No. 56 - Ex. 1 Preece Depo. p. 28-29, 37-38.  The parties agree the plaintiff's job title was that of a "director" overseeing the youth program or youth ministry.  **See** Filing No. 56 - Ex. 1 Preece Depo. p. 10, 26, 37-38; Filing No. 98 - Ex. 1

5

Preece Depo. p. 34 ("I considered myself a director to [the defendant]."); Filing No. 101 - McDonald Aff. ¶ 4 ("The [defendant] employed Plaintiff as Director of Youth Ministry(ies)."); Filing No. 80 - PTO ¶ 18.  A director in the church was treated differently than a "called" or ordained staff member in some regards.  **See, e.g.**, TR. 36-37.  The plaintiff had a role recognized by both himself and the defendant which was distinct from that of most of the defendant's members; he had education and experience reflecting significant religious training; and he obtained religious ordination, albeit not through the defendant.  Nevertheless, the plaintiff's title and the origin of his ordination is less important than the plaintiff's actual position in the church and duties.

Accordingly, the court must make "a determination of the [plaintiff's] functions" for the church.  **See *Ross***, 471 F. Supp. 2d at 1306.  The plaintiff argues he was merely a secular employee because he was neither ordained clergy in the Evangelical Presbyterian Church nor was he engaged in primarily religious activities.  Specifically, the plaintiff contends his actual work conduct undermines his perceived duties or job listing requirements as presented by the defendant.  For example the defendant's job listing states the Director of Youth Ministry was "[r]esponsible for leading and delivering the Wednesday evening student worship service," however the plaintiff testified, "[w]e never really had a worship service on Wednesday nights."  **Compare** Filing No. 58 - Ex. 10 Job Description **with** Filing No. 56 - Ex. 1 Preece Depo. p. 57-58 (stating "we had what's called a party night . . . once a month at least").  In fact, the plaintiff denies engaging in many of the tasks listed on the defendant's formal job description for the Director of Youth Ministry, stating his employment included many informal tasks.  ***Id.*** at 39, 51, 58-59; **see** Filing No. 58-3 - Ex. 10 Job Duty Listing.  Still the plaintiff admits his employment duties included chaperoning mission trips, teaching eighth grade confirmation class, and teaching bible school classes.  ***Id.*** at 53, 56-58.  Additionally, the plaintiff agreed his actual duties included: (a) daily interaction with the youth of the Church; (b) ensuring the spiritual needs of the youth of the Church were met in a professional and ethical manner; (c) planning, developing, and implementing programs to expand and improve the youth ministry; (d) performing on-going evaluations of existing youth program and making changes when necessary; (e) budgeting for the youth program; (f) teaching youth programs in the ways of the Church; and (g)

6

recruiting, training, and motivating volunteers from middle school and high school and providing ongoing support for team leaders for the Church's Wednesday evening youth program.  **See** Filing No. 56 - Ex. 1 Preece Depo. p. 45-46, 51, 53-60; Filing No. 58-3 - Ex. 10 Job Duty Listing.  The plaintiff also described the youth program as including a night of having "someone to come in . . . and share their story of what their faith meant to them."  **See** Filing No. 56 - Ex. 1 Preece Depo. p. 57.  Also, "[w]e had a night where we would do a Bible study."  *Id.*  When asked if he was involved, the plaintiff said, "I primarily taught it."  *Id.*  Pastor McDonald described the plaintiff's role as "imparting [the defendant's] mission onto the youth . . . [by] teaching the youth (children in grades 6-12) the Christian Reformed basic tenets of the Church--worship, fellowship, discipleship, mission, and evangelism."  **See** Filing No. 101 McDonald Aff. ¶ 5; TR. 9-11.  Pastor McDonald described the plaintiff's job as teaching the Bible, discipleship, the church's understanding of the Sacraments in the Reformed tradition, and the importance of Holy Scripture in the lives of the youth.  **See** TR. 11.  Specifically, Pastor McDonald described the mission of the defendant as to know Christ and to make Him known, including the "basic instructional discipleship living, how to be a follower of Jesus Christ."  **See** TR. 11-13.  The plaintiff was the leader of the student confirmation process, including the planning and leading the worship service culminating in the student's commissioning into adult membership, and overseeing the development of the entire youth program, including teaching or training staff.  **See** TR. 12-13. Pastor McDonald elaborated on the purpose and details of the mission trips to include construction projects for underprivileged groups, daily worship, and discipleship training. **See** Filing No. 101 McDonald Aff. ¶ 7(j); TR. 17-18.  In addition, the plaintiff played guitar as part of the contemporary youth band at the contemporary service and occasionally preached to the entire congregation.  **See** TR. 13-16.

The plaintiff's job duties reflected a role in him conveying the defendant's message and carrying out its mission.  The defendant trusted the plaintiff to lead the youth through the tenets of the religion with, at least, weekly confirmation and bible school classes, with additional instruction in worship, discipleship, fellowship, mission work, and evangelism activities.  While the plaintiff may have conducted secular duties, the precise division of secular and religious labor is immaterial particularly when the

7

mission work led by the plaintiff incorporated and embodied the core teachings of the church.  **See** **_Scharon_**, 929 F.2d at 363 (finding position "is primarily a 'ministerial' position [when] the performance of secular activities in that role does not diminish its religious nature").  Accordingly, the court concludes the defendant engaged the plaintiff as a ministerial employee with duties of a religious and spiritual nature such that he is covered by the ministerial exception.

The court must also address the kinds of employment decisions covered by the ministerial exception.  No dispute exists whether the ministerial exception applies to state law employment discrimination claims "because the Establishment and Free Exercise Clauses apply to the States through the Fourteenth Amendment by incorporation".  **_Conlon_**, 777 F.3d at 836-37 (applying exception to state law claims citing **_Hosanna-Tabor_**, 132 S. Ct. at 709 n.3).  The law is less clear about application of the ministerial exception to all types of Title VII claims.

The Eighth Circuit recognized application of Title VII to cases between a religious institution and its employees primarily in a ministerial position "give rise to serious constitutional questions" in 1991.  **See** **_Scharon_**, 929 F.2d at 361-62.  Specifically, the **_Scharon_** court determined the First Amendment prohibited the court from deciding whether the religious institution terminated an ordained priest for violating several canonical laws or in violation of discrimination statutes based on age and gender.  **_Id._** The Eighth Circuit cautioned courts "to consider these situations on a case-by-case basis, looking in each case to see whether the plaintiff's employment discrimination claim can be adjudicated without entangling the court in matters of religion."  **_Id._** at 363 n.3 (suggesting such cases are "where the duties of the employees were not of a religious nature").

The Eighth Circuit courts have also applied the ministerial exception to Title VII cases including those for discrimination and retaliation.  **See** **_McNeil v. Missouri Annual Conference of United Methodist Church_**, 412 Fed. Appx. 912 (8th Cir. 2011) (ministerial exception applied to bar ministry candidate's ADA retaliation suit) *aff'g* **_McNeil v. Missouri Annual Conference of United--Methodist Church_**, 2010 WL 3732191, at *5 (W.D. Mo. Sept. 20, 2010); **_Cooper-lgwebuike v. United Methodist_**

*Church*, 160 Fed. Appx. 549 (8th Cir. 2005) (ministerial exception barred Reverend's Title VII action based on denial of appointment as a full elder due to race).

Some courts recognize there may be a "category of harassment or abuse-based claims . . . outside the core ecclesiastical concerns implicated in clergy selection." *Leavy v. Congregation Beth Shalom*, 490 F. Supp. 2d 1011, 1024 (N.D. Iowa 2007) (discharging rabbi with a broken foot (disability) for failing to provide pastoral leadership but noting "This circuit has also maintained a sharp distinction between lay employees of religious organizations and employees acting in a ministerial or pastoral capacity."). Such cases may implicate "vastly different issues and analysis." *Id.* (citing *Bollard v. Cal. Province of Soc'y of Jesus*, 196 F.3d 940 (9th Cir. 1999) (holding the ministerial exception did not apply in a sexual harassment constructive discharge suit) and *Malicki v. Doe*, 814 So.2d 347 (Fla. 2002) (holding the ministerial exception did not apply to negligent hiring and supervision claims related to alleged sexual assault by clergy)). The Ninth Circuit in *Bollard* found a sexual harassment claim may be different from other employment discrimination claims because:  (1) the church was not "exercising its constitutionally protected prerogative to choose its ministers"; (2) the church was not "embracing the behavior at issue as a constitutionally protected religious practice"; and (3) allowing the case to proceed did not raise sufficiently significant issues about government entanglement with religion under the Establishment Clause. *Bollard*, 196 F.3d at 944, 949; **but see** *Werft v. Desert Sw. Annual Conference of United Methodist Church*, 377 F.3d 1099, 1103 (9th Cir. 2004) (noting despite *Bollard*, "a minister's working conditions and the church's decision regarding whether or not to accommodate a minister's disability, are a part of the minister's employment relationship with the church").  Even when refusing to apply it to certain claims within an action, the ministerial exception "precludes [the plaintiff] from seeking *remedies* that implicate [ministerial] decisions." *Elvig v. Calvin Presbyterian Church*, 375 F.3d 951, 966 (9th Cir. 2004) (holding the ministerial exception partially foreclosed a sexual harassment suit because it did not apply to sexual harassment or its retaliation, but allowing damages only for emotional distress and reputational harm).

By contrast, other courts held "[t]he 'ministerial exception' applies without regard to the type of claims being brought." *Alicea-Hernandez v. Catholic Bishop of*

9

*Chicago*, 320 F.3d 698, 703 (7th Cir. 2003).  The type of claim is irrelevant because "any Title VII action brought against a church by one of its ministers will improperly interfere with the church's right to select and direct its ministers free from state interference," thus barring review of a Title VII hostile work environment claim. *Skrzypczak v. Roman Catholic Diocese of Tulsa*, 611 F.3d 1238, 1245-46 (10th Cir. 2010) ("This approach provides greater clarity in the exception's application and avoids the kind of arbitrary and confusing application the Ninth Circuit's approach has created."); **see** *Combs v. Cent. Tex. Annual Conference of United Methodist Church*, 173 F.3d 343, 350 (5th Cir. 1999) (holding in allowing such claims "secular authorities would necessarily intrude into church governance in a manner that would be inherently coercive, even if the alleged discrimination were purely nondoctrinal"); **see also** *Ogugua v. Archdiocese of Omaha*, No. 8:07CV471, 2008 WL 4717121 (D. Neb. October 22, 2008) (Smith Camp) (dismissing assistant pastor's claim of sexual harassment by pastor as factually entwined and related to adverse employment actions, which the court could not review without excessive government entanglement with religion in violation of the First Amendment).  Even in a constructive discharge case, review of "a church's employment of its clergy would almost always entail excessive government entanglement into the internal management of the church." *Gellington v. Christian Methodist Episcopal Church, Inc.*, 203 F.3d 1299, 1304 (11th Cir. 2000). While the *Hosanna-Tabor* Court explicitly held "only that the ministerial exception bars" "an employment discrimination suit brought on behalf of a minister, challenging her church's decision to fire her" and "express[ed] no view on whether the exception bars other types of suits, including actions by employees alleging breach of contract or tortious conduct by their religious employers," the Court contrasted the employment discrimination suit with cases involving law violations "of only outward physical acts." *Hosanna-Tabor*, 132 S. Ct. at 707, 710.  Nevertheless, the Court noted "a church's selection of its ministers is unlike an individual's ingestion of peyote [because the employment relationship] concerns government interference with an internal church decision that affects the faith and mission of the church itself." *Id.* at 707.

In this case, the defendant's treatment of the plaintiff in relation to his sexual harassment allegation clearly implicates an internal church decision and managment,

rather than the outward physical acts of one pastor.   Accordingly, like the *Ogugua* court, this court finds the plaintiff's sexual harassment claim is factually entwined and related to the plaintiff's other claims, which the court may not review without excessive government entanglement with religion in violation of the First Amendment.   Upon consideration,

**IT IS ORDERED**:

1.      The defendant employed the plaintiff as a ministerial employee covered by the ministerial exception barring the plaintiffs employment discrimination claims.

2.      The plaintiff Richard Jeremiah Preece's claims against the defendant The Covenant Presbyterian Church are dismissed.

3.      A separate judgment will be entered.

Dated this 22nd day of April, 2015.

BY THE COURT:

 s/ Thomas D. Thalken
United States Magistrate Judge

11